**2020 WI App 25**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2019AP21-CR

Complete Title of Case:

**STATE OF WISCONSIN,**

      **PLAINTIFF-RESPONDENT,**

  **V.**

**KEITH M. ABBOTT,**

      **DEFENDANT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | April 16, 2020 |
| Submitted on Briefs: | October 4, 2019 |

| | |
|---|---|
| JUDGES: | Blanchard, Graham and Nashold, JJ. |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Frances Colbert*, assistant state public defender. |
| Respondent<br>ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Amy C. Miller*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

April 16, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP21-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2011CF1324

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

KEITH M. ABBOTT,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Rock County: MICHAEL A. HAAKENSON, Judge. *Affirmed.*

Before Blanchard, Graham, and Nashold, JJ.

¶1 GRAHAM, J. Keith Abbott appeals a judgment of conviction for second-degree intentional homicide, which the circuit court entered after accepting

Abbott's *Alford* plea.[1]  Abbott argues that the circuit court erred by denying his motions to suppress two sweatshirts that police seized at his residence, a transparent "patient belongings bag" containing other clothing that police seized at a hospital, and statements that Abbott made to investigators during a custodial interrogation. We conclude that the circuit court properly denied the motions to suppress Abbott's sweatshirts and statements.  We also conclude that the State did not meet its burden to prove that the seizure of the patient belongings bag falls within an exception to the warrant requirement.  Nevertheless, we conclude that the circuit court's failure to suppress this evidence was harmless.  Accordingly, we affirm the circuit court.

## BACKGROUND

¶2      In the early morning of January 3, 2011, Abbott returned to the home he shared with his wife, Ermelinda Cruz.  He told Cruz that he had been having an affair with Kristin Miller and that he thought he had killed her.  Cruz called the police, and Officers Gary Kovacs and Robert Gelden arrived at the home at approximately 6:30 a.m.  At that time, Cruz did not inform the officers about the incriminating statement that Abbott had made.

¶3      The officers found Abbott sitting on the living room floor, shaking and unresponsive to questioning.  Medical personnel arrived and, during their examination of Abbott, they removed two sweatshirts that he was wearing and placed them on the living room floor.  Abbott was transported to a hospital, and both

---

[1] "An *Alford* plea is a plea in which the defendant agrees to accept a conviction while simultaneously maintaining his or her innocence," and it is equivalent for most purposes to a guilty plea.  *State v. Kelty*, 2006 WI 101, ¶18 n.10, 294 Wis. 2d 62, 716 N.W.2d 886; *see also North Carolina v. Alford*, 400 U.S. 25 (1970).

officers left the home. Officer Kovacs escorted Abbott to the emergency room and then left the hospital.

¶4    Later that morning, Officer Kovacs received a voicemail message from a nurse indicating that Abbott had suspicious injuries and that she had observed suspicious spots on his clothing. Officer Kovacs returned to the hospital at approximately 9:30 a.m. Soon after, he called Officer Gelden and asked him to return to Abbott's home.

¶5    When Officer Gelden returned to Abbott's home, he observed what he believed to be blood on the tailgate of Abbott's pickup truck. He spoke to Cruz, who told him that Abbott had been missing for two days, that Abbott and Miller had been having an affair, that Miller had allegedly been blackmailing Abbott, and that Abbott said he may have killed Miller. Cruz also told Officer Gelden that she was seeking a divorce and that Abbott was currently living in the basement. Officer Gelden asked if he could take the sweatshirts that Abbott had been wearing, which remained on the living room floor, and Cruz assented. Later testing confirmed that Miller's blood was on the sweatshirts, and also on Abbott's pickup truck. Officer Gelden's seizure of the sweatshirts is the subject of Abbott's first claim of error in this appeal.

¶6    Meanwhile, Officer Kovacs remained at the hospital until approximately 6:00 p.m. At some point after his arrival, a hospital employee gave him a transparent plastic bag, which we refer to as a "patient belongings bag," and which contained articles of the clothing that hospital staff had removed in the course of treatment. Later testing confirmed that Miller's blood was on Abbott's shoes and socks contained in the patient belongings bag. Officer Kovacs' seizure of the patient belongings bag is the subject of Abbott's second claim of error.

¶7　At approximately 6:00 p.m. that day, Abbott was committed pursuant to WIS. STAT. § 51.15 (2017-18),[2] which permits law enforcement to involuntarily detain individuals on an emergency basis due to mental health concerns. After Abbott was released, he continued to receive outpatient mental health treatment and exhibited physical ticks and shaking, apparent memory loss, and apparent emotional distress.

¶8　Miller's body was discovered on January 31, 2011. Police arrested Abbott on February 1 and conducted an interrogation. The officers read Abbott his *Miranda* rights and repeatedly asked whether he would answer questions without an attorney present.[3] They considered his responses to the questions about whether he wanted an attorney to be ambiguous and did not cease the interrogation. The officers' failure to cease questioning is the subject of Abbott's third claim of error, and additional facts related to the custodial interrogation are set forth in the discussion section below.

¶9　The State charged Abbott with first-degree intentional homicide and related counts. The criminal proceedings were delayed for several years by competency evaluations, but Abbott was eventually determined competent to stand trial. Abbott then moved to suppress certain evidence. After the circuit court denied some but not all of Abbott's suppression motions, he entered an *Alford* plea to second-degree intentional homicide and was sentenced. Abbot appealed pursuant

---

[2] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted. Although Abbott was committed in 2011, we cite the most recent version of the statutes for ease of reference, as the relevant portions of the statute have not changed.

[3] *See* *Miranda v. Arizona*, 384 U.S. 436 (1966) (addressing Fifth Amendment rights of persons subject to custodial interrogation).

4

to WIS. STAT. § 971.31(10) and argues on appeal that his conviction should be reversed.

## STANDARD OF REVIEW

¶10 An order granting or denying a suppression motion presents a question of constitutional fact. *State v. Howes*, 2017 WI 18, ¶17, 373 Wis. 2d 468, 893 N.W.2d 812. "A question of constitutional fact is a mixed question of law and fact to which we apply a two-step standard of review. We review any challenges to the circuit court's findings of historical fact under the clearly erroneous standard, and we review independently the application of those facts to constitutional principles." *State v. Tomaszewski*, 2010 WI App 51, ¶5, 324 Wis. 2d 433, 782 N.W.2d 725.

## DISCUSSION

¶11 Abbott argues that officers seized his sweatshirts and the patient belongings bag in violation of the Fourth Amendment, and that officers violated the Fifth Amendment during the custodial interrogation by continuing to question him after he invoked his right to counsel. We address Abbott's Fourth Amendment challenges in Section I, and then in Section II, we turn to his Fifth Amendment challenge. We conclude that the circuit court erred by denying Abbott's motion to suppress the patient belongings bag, and in Section III, we address the parties' arguments regarding harmless error.

### I. Fourth Amendment Arguments

¶12 The Fourth Amendment protects against "unreasonable searches and seizures" by the government. U.S. CONST. amend. IV. Seizures conducted without a warrant are unreasonable unless they fall within a recognized exception to the

warrant requirement. *See State v. Brereton*, 2013 WI 17, ¶24, 345 Wis. 2d 563, 826 N.W.2d 369. The State bears the burden to prove that one of the exceptions to the warrant requirement applies. *State v. Denk*, 2008 WI 130, ¶36, 315 Wis. 2d 5, 758 N.W.2d 775.

## A. The Sweatshirts

¶13    Abbott argues that evidence gathered from his sweatshirts must be suppressed. As noted above, Cruz told Officer Gelden that he could take Abbott's sweatshirts, which were lying on the floor in the living room of the marital home. Abbott acknowledges that Cruz consented to the seizure, but he argues that she did not have authority to give consent.

¶14    Consent is an exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A third party may consent to a search of someone else's property when the third party shares "common authority" over that property. *United States v. Matlock*, 415 U.S. 164, 171 (1974). The same "common authority" standard that applies in the search context also determines whether a third party can consent to a seizure. *State v. Ramage*, 2010 WI App 77, ¶¶11-12, 325 Wis. 2d 483, 784 N.W.2d 746; *see also United States v. James*, 571 F.3d 707, 714 (7th Cir. 2009). And even if *actual* common authority is lacking, there may be *apparent* common authority when the information available to the police officers at the time of the search or seizure would justify a reasonable belief that the party consenting had the authority to do so. *State v. Pickens*, 2010 WI App 5, ¶39, 323 Wis. 2d 226, 779 N.W.2d 1.

¶15    Whether common authority exists depends on whether the third party has "joint access [to] or control" over the individual's property such that the individual has "assumed the risk" of the intrusion. *Matlock*, 415 U.S. at 171 n.7.

Common authority to consent depends on the "totality of the circumstances," and the State has the burden of proving consent by clear and convincing evidence. *State v. Tomlinson*, 2002 WI 91, ¶¶21, 31, 254 Wis. 2d 502, 648 N.W.2d 367. "[W]idely shared social expectations" are an important factor in determining common authority. *State v. Sobczak*, 2013 WI 52, ¶15, 347 Wis. 2d 724, 833 N.W.2d 59 (quoting *Georgia v. Randolph*, 547 U.S. 103, 111 (2006)).

¶16 For the reasons we now explain, we conclude that Cruz had *actual* authority to consent to the seizure. Abbott acknowledges the presumption noted by one federal circuit court that a spouse "presumptively has authority to consent to a search of all areas of the homestead." *United States v. Duran*, 957 F.2d 499, 505 (7th Cir. 1992). However, he makes three arguments in an attempt to rebut this conclusion in this case. Specifically, Abbott argues that common authority was lacking because he and Cruz were "estranged," his sweatshirts were "personal effects," and the sweatshirts had been "forcibly removed" from him by medical personnel. We consider each of these arguments in turn.

¶17 We do not agree that what Abbott calls "estrangement" negated Cruz's common authority to consent to the seizure of the sweatshirts. Abbott notes that he had an affair, that he was living in the basement, and that Cruz planned to divorce him. However, despite their strained relationship, Abbott and Cruz were still cohabitating, and Cruz testified that she still had access to the unlocked basement where Abbott was living. Abbott cites no authority suggesting that marital strain overcomes a spouse's common authority over marital property, and this is a particularly tenuous argument where, as here, the spouses continued to cohabitate in the marital home and had joint access to one another's living areas.

7

¶18 Citing *United States v. Rodriguez*, 888 F.2d 519 (7th Cir. 1989) and *State v. Evans*, 372 P.2d 365 (Haw. 1962), Abbott argues that spouses do not necessarily have common authority over one another's "personal effects." We are not persuaded. The item at issue in *Rodriguez* was a briefcase stored in a locked room, 888 F.2d at 523, and the item at issue in *Evans* was jewelry hidden in a cuff links case stored in the defendant's closed bureau drawer, 372 P.2d at 368. Here, by contrast, nothing suggests that Cruz's access to Abbott's sweatshirts was limited in any way. The sweatshirts were not in a locked room or closed container, but were instead on the living room floor in Cruz's own living quarters. Further, it is beyond dispute that in today's society, spouses routinely move, clean, and even wear one another's clothing. *Cf. Matlock*, 415 U.S. at 171 n.7 (common authority rests on "joint access or control"); *Sobczak*, 347 Wis. 2d 724, ¶15 ("widely shared social expectations" are an important factor in determining common authority). Abbott points to no facts in the record suggesting he took steps to keep his clothing private from his wife, and he even concedes that Cruz might have worn his clothes.

¶19 Finally, Abbott argues that his sweatshirts were "forcibly removed from him during a medical emergency," but Abbott does not explain why this matters. Common authority depends on "joint access or control," *Matlock*, 415 U.S. at 171 n.7, and Abbott cites no authority to show that any act of relinquishing control to a third party is required.

¶20 For the above reasons, we conclude that the State has proven by clear and convincing evidence that Cruz had actual authority to consent to the warrantless seizure of Abbott's sweatshirts and that the circuit court did not err when it denied Abbott's motion to suppress them. Having reached this conclusion, we do not address the State's alternative arguments that Cruz had apparent authority to consent and that the sweatshirts were properly seized under the plain view doctrine.

## B. The Patient Belongings Bag

¶21     As noted above, at some time between approximately 9:30 a.m. and 6:00 p.m. on January 3, 2011, an unidentified hospital staff member gave Officer Kovacs a transparent patient belongings bag containing clothing removed from Abbott at the hospital.  The State argues that Officer Kovacs was entitled to search the patient belongings bag pursuant to *United States v. Jacobsen*, 466 U.S. 109 (1984), and that he properly seized the bag under the plain view warrant exception.[4]

¶22     We begin with the State's argument under *Jacobsen*.  According to that case, when a private party searches a suspect's property, law enforcement may similarly search that property without offending the Fourth Amendment because the private search has already frustrated the suspect's privacy interests.  *Jacobsen*, 466 U.S. at 121.  However, the Supreme Court qualified this rule by explaining that any additional interference with the suspect's privacy interests beyond scope of the private search "must be tested by the degree to which [it] exceeded the scope of the private search." *Id.* at 120.

¶23     Under *Jacobsen*, Officer Kovacs may well have had authority to visually inspect Abbott's clothing, since hospital staff had already done so and discovered what they described as suspicious spots on Abbott's socks.  But Abbott

---

[4] The circuit court concluded that the patient belongings bag was properly seized on a ground that the State does not advance in this appeal.  The court concluded that under *State v. Thompson*, 222 Wis. 2d 179, 585 N.W.2d 905 (Ct. App. 1998), the Fourth Amendment did not apply because Abbott had no reasonable expectation of privacy in any personal effects left in a hospital treatment room.  In his initial brief, Abbott argues that the circuit court's conclusion was based on an erroneous interpretation of *Thompson*, and the State does not respond to this argument. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (failure to respond to an argument may be taken as a concession).  We do not further discuss whether Thompson would provide a basis for affirming the circuit court.

does not challenge the inspection of his clothing—he challenges the *seizure* of the patient belongings bag and the DNA evidence subsequently gathered from it, which goes beyond the scope of the hospital's private search.  The State fails to make any argument as to how ***Jacobsen*** permits these additional intrusions.  Nor did it argue that the Fourth Amendment is inapplicable because the bag was seized by a private entity, rather than by law enforcement.[5]  Thus, the State fails to persuade us that evidence gathered from the patient belongings bag is admissible under ***Jacobsen***.

¶24     We turn next to the argument that the plain view exception permitted the warrantless seizure of Abbott's personal belongings bag.[6]  The plain view exception applies when the following three conditions are met:

> (1) the evidence must be in plain view; (2) the officer must have a prior justification for being in the position from which she discovers the evidence in plain view; and (3) the evidence seized in itself or in itself with facts known to the officer at the time of the seizure, [must provide] probable cause to believe there is a connection between the evidence and criminal activity.

***State v. Guy***, 172 Wis. 2d 86, 101-02, 492 N.W.2d 311 (1992) (internal quotations omitted).  Abbott contends that the State has not met its burden to show the first or third conditions.  We do not address Abbott's argument that the bag was not in plain

---

[5] *See **State v. Payano-Roman**,* 2006 WI 47, ¶18, 290 Wis. 2d 380, 714 N.W.2d 548 (holding that a "private search" may fall outside the Fourth Amendment if:  (1) the police did not initiate, encourage or participate in the private entity's search; (2) the private entity engaged in the activity to further its own ends or purpose; and (3) the private entity did not conduct the search for the purpose of assisting governmental efforts).

[6] Abbott argues that the State forfeited this argument by failing to raise it below.  But a respondent may generally "employ any theory or argument on appeal that will allow us to affirm the trial court's order, even if not raised previously," ***Finch v. Southside Lincoln-Mercury, Inc.*** 2004 WI App 110, ¶42, 274 Wis. 2d 719, 685 N.W.2d 154, and Abbott has not presented us with a good reason to consider the argument forfeited under the circumstances here.

view, since we agree with Abbott that the State has failed to meet its burden to prove that there was probable cause at the time of the seizure.

¶25 The State argues that Officer Kovacs had probable cause to seize the patient belongings bag based upon three facts he gathered after returning to the hospital: that Miller was "missing," that a hospital staff member believed the spots on Abbott's socks were blood, and that Abbott's brothers told Officer Kovacs that Abbott "may have done something bad." The problem with this argument is that the State did not introduce any evidence that Officer Kovacs was aware of these facts at the time of the seizure.[7] The circuit court found that "it's unclear when that seizure [] occurred," and the State does not challenge this finding as clearly erroneous. It is supported by the record, which establishes only that Officer Kovacs seized the bag at some point after he returned to the hospital that day. Evidence that may have been gathered *after* the seizure cannot be used to show probable cause existed at the time of the seizure.[8]

¶26 Accordingly, the only facts in the record that could establish probable cause for the seizure are those that were undisputedly known to Officer Kovacs at the time he arrived at the hospital: that Abbott was exhibiting signs of a mental breakdown requiring medical attention, and that a nurse believed there were suspicious injuries and suspicious spots on Abbott's clothing. The State makes no

---

[7] Officer Kovacs must have learned the first two facts (that Miller was missing and that a hospital staff member suspected the spots on Abbott's socks were blood) soon after returning to the hospital because he relayed these facts when he called Officer Gelden from the hospital at approximately 9:30 a.m. But the record does not rule out the possibility that the seizure occurred during the short period *after* Officer Kovacs returned to the hospital and *before* he learned those facts.

[8] The State does not argue that either of two Fourth Amendment doctrines, collective knowledge or inevitable discovery, resolves this gap in the evidentiary record. Therefore we do not address these doctrines.

argument that these facts, without more, suffice to give Officer Kovacs probable cause to seize the patient belongings bag.

¶27    We conclude that the State has failed to meet its burden to show by clear and convincing evidence that the plain view exception applies. Based on the limited record made before the circuit court, the contents of the patient belongings bag should have been suppressed. We address the proper remedy for the circuit court's failure to suppress this evidence in Section III below.

## II.  Fifth Amendment Challenge to Custodial Statements

¶28    We next consider Abbott's argument that the statements he made during the February 1 interview should be suppressed because he invoked his right to counsel. Abbott acknowledges that he did not make any unequivocal statement asking for an attorney, but he appears to argue that no such statement was needed to invoke the right to counsel since officers should have understood that he "did not have all his faculties" and was "not capable of asserting his right to an attorney."

¶29    For purposes of understanding our resolution of this argument, it is essential to distinguish between, on the one hand, a valid *waiver* of *Miranda* rights, and, on the other hand, a later *invocation* of those rights. This distinction is important because the circuit court concluded that Abbott voluntarily waived his *Miranda* rights, and Abbott does not challenge that conclusion. Instead, Abbott argues that officers should have understood that he invoked his right to an attorney at some point during the custodial interrogation, and that after that point all questioning should have ceased.

¶30    The Fifth Amendment guarantees certain rights to persons subject to custodial interrogation. U.S. CONST. amend. V; *Miranda v. Arizona*, 384 U.S. 436,

467-79 (1966); *see also State v. Edler*, 2013 WI 73, ¶23, 350 Wis. 2d 1, 833 N.W.2d 564. These include the right to refuse to answer questions and the right to have counsel present during interrogation. *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981). A suspect must be informed of these rights before custodial interrogation. *Miranda*, 384 U.S. at 478-79.

¶31 A suspect may choose to waive these rights, and if so, the waiver need not be explicit. *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979). "The State establishes an 'implicit waiver' when it demonstrates that 'a *Miranda* warning was given and that it was understood by the accused' and that the accused then went on to make an uncoerced statement." *State v. Hampton*, 2010 WI App 169, ¶32, 330 Wis. 2d 531, 793 N.W.2d 901 (quoting *Berguis v. Thompkins*, 560 U.S. 370, 384 (2010)). However, the State must always show that the waiver was knowing and voluntary. *Butler*, 441 U.S. at 373. The suspect's mental condition is a "significant factor" in this analysis. *Colorado v. Connelly*, 479 U.S. 157, 164, 169-70 (1986).

¶32 Separately, even after a suspect waives his *Miranda* rights, the suspect may later decide to *invoke* the right to remain silent or the right to have counsel present. *Miranda*, 384 U.S. at 473-74. To invoke either right, a suspect must do so "unambiguously." *Thompkins*, 560 U.S. at 384. To invoke the right to counsel, a suspect must make an "unambiguous [and] unequivocal request for counsel …." *Davis v. United States*, 512 U.S. 452, 462 (1994). If "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459. However, once a suspect unambiguously invokes the right to counsel, all uncounseled questioning must cease. *See State v. Stevens*, 2012 WI 97, ¶48, 343 Wis. 2d 157, 822 N.W.2d 79.

¶33    Having explained the applicable law, we now more fully describe Abbott's February 1 custodial interrogation. After Abbott's arrest, officers read him his *Miranda* rights, and Abbott indicated he understood them. The officers then repeatedly asked Abbott if he would answer questions without an attorney present. Abbott's responses were generally ambiguous, and included statements such as "I don't want to get in trouble with [my attorney]," "Ask [my attorney] if it's okay," and "[my attorney] said to have him here." The officers did not cease uncounseled questioning.

¶34    The circuit court concluded that Abbott understood his rights and that he knowingly and voluntarily waived them, and as noted above Abbott does not appeal that determination. The court also concluded that Abbot did not unambiguously invoke his right to counsel until near the end of the interrogation, when he said, "I want [my attorney] to be here," and it suppressed statements made after that point.

¶35    On appeal, Abbott argues that he actually invoked his right to counsel at an earlier point, and therefore questioning should have ceased earlier. However, Abbott does not specifically identify *when* he invoked his right to counsel, nor does he point to any specific statement he made to the officers,[9] much less the unequivocal and unambiguous request required by *Davis*. Rather, Abbott appears to argue that the requirement of an unequivocal and unambiguous request should be relaxed since "[u]nder the circumstances, a reasonable officer interviewing [him] would have recognized that [he] did not have all his faculties" and was "not capable of asserting his right to an attorney." In support of this argument, Abbott notes that

---

[9] Although Abbott points out that he made ambiguous references to his attorney, *see supra* ¶33, he does not argue that any of these statements invoked his right to counsel.

he exhibited "physical ticks and shaking" during the questioning, that his answers to questions were "nonsensical" and "childish," that the officers were aware he had recently been hospitalized for mental health treatment, and that the circuit court found that he was "certainly upset" and "had a difficult time processing things." Abbott's argument appears to be that, due to his apparent mental condition, he did not need to make *any* particular statement to invoke his right to counsel, and that his disturbed condition was itself a sufficient invocation.

¶36 Abbott's argument is not consistent with the law. As explained above, a suspect's personal characteristics can be relevant to whether they knowingly and voluntarily *waived* their **Miranda** rights, but Abbott does not point us to any law suggesting that a suspect's apparent mental state can relax the requirement that the right to counsel be *invoked* with an unambiguous and unequivocal statement.[10] Abbott's proposition is contrary to **Davis**, which explains that the right to counsel must be invoked unambiguously even though this rule "might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present." 512 U.S. at 460. For these reasons, we conclude that the circuit court did not err when it declined to suppress Abbott's earlier statements from the custodial interrogation.

### III. Harmless Error

¶37 We have concluded that the circuit court properly denied the motions to suppress Abbott's sweatshirts and earlier statements from the custodial

---

[10] The Ninth Circuit case that Abbott cites, **Sample v. Eyman**, 469 F.2d 819, 821 (9th Cir. 1972), addresses the requirements for a knowing and intelligent *waiver* under **Miranda**, not the question of how a suspect may *invoke* that right. We find nothing in **Sample** to support the position that Abbott was not required to unambiguously invoke his right to counsel.

interrogation, but that the circuit court should have granted Abbott's motion to suppress the patient belongings bag. We now turn to the parties' arguments about the appropriate remedy.

¶38 For more than two decades, Wisconsin courts have consistently applied the harmless error test in cases like this, where a defendant enters a guilty plea[11] and then successfully appeals the circuit court's denial of a motion to suppress evidence. See *State v. Armstrong*, 223 Wis. 2d 331, 368-71, 588 N.W.2d 606, *opinion modified on denial of reconsideration*, 225 Wis. 2d 121, 591 N.W.2d 604 (1999); *see also State v. Rockette*, 2005 WI App 205, ¶¶26-27, 287 Wis. 2d 257, 704 N.W.2d 382; *State v. Semrau*, 2000 WI App 54, ¶22, 233 Wis. 2d 508, 608 N.W.2d 376. Even though the law on this issue has been settled for years, the State urges us to "clarify" the law and adopt a different standard—the manifest injustice standard—for cases like this. We first consider and reject the State's argument that manifest injustice should be the applicable standard, and then we apply the harmless error test to the facts of this case.

¶39 To understand our reasons for rejecting the State's argument that the manifest injustice standard should apply, it is helpful to understand the relationship between that standard and what we refer to as the "guilty plea waiver rule." Pursuant to the guilty plea waiver rule, a defendant who pleads guilty waives the right to raise almost all claims of constitutional error on appeal. *See State v. Riekkoff*, 112 Wis. 2d 119, 123-25, 332 N.W.2d 744 (1983). Under most circumstances, a defendant may not withdraw a guilty plea after sentencing unless the defendant proves by clear and convincing evidence that plea withdraw is required to correct a

_____

[11] Though this case involves an *Alford* plea rather than a guilty plea, these pleas are equivalent for the purposes of a WIS. STAT. § 971.31(10) appeal. *See State v. Rockette*, 2005 WI App 205, ¶25, 287 Wis. 2d 257, 704 N.W.2d 382.

"manifest injustice." *Hatcher v. State*, 83 Wis. 2d 559, 564, 266 N.W.2d 320 (1978). The manifest injustice standard sets a high bar for overcoming waiver.

¶40 There is one statutory exception to the guilty plea waiver rule. Under WIS. STAT. § 971.31(10), a defendant who pleads guilty does *not* waive the right to appeal an order denying a motion to suppress evidence. *See id.* ("An order denying a motion to suppress evidence or a motion challenging the admissibility of a statement of a defendant may be reviewed upon appeal from a final judgment or order notwithstanding the fact that the judgment or order was entered upon a plea of guilty or no contest ….").

¶41 Prior to 1999, a defendant who pleaded to charges and then prevailed in a WIS. STAT. § 971.31(10) appeal was entitled to reversal, without regard to whether the error prejudiced the defendant. *See*, *e.g.*, *State v. Monahan*, 76 Wis. 2d 387, 251 N.W.2d 421 (1977). Then, in *Armstrong*, 223 Wis. 2d at 368-71, the Wisconsin Supreme Court announced that § 971.31(10) appeals are subject to a harmless error test. *Armstrong* explained that "the test for harmless error on appeal is whether there is a reasonable possibility that the erroneous admission of the disputed evidence contributed to the conviction." *Semrau*, 233 Wis. 2d 508, ¶22. Stated differently, a defendant prevailing in a § 971.31(10) appeal is entitled to reversal unless the State proves that the defendant would have entered the plea even if the evidence had been suppressed. *See Armstrong*, 223 Wis. 2d at 370-71.

¶42 The State asserts that there is "inconsistent" case law on whether the manifest injustice or the harmless error test applies, and it urges us to follow the Wisconsin Supreme Court's "most recent pronouncement" on this subject. But the State cites only one case in support of its assertion that the case law is inconsistent, and that case is inapt. In *State v. Taylor*, 2013 WI 34, ¶¶43-47, 347 Wis. 2d 30, 829

17

N.W.2d 482, the Wisconsin Supreme Court determined that the manifest injustice standard applies when a defendant seeks to withdraw a guilty plea based on an error in the plea colloquy. *Taylor* is inapt because plea colloquy error is not governed by WIS. STAT. § 971.31(10). The fact that Wisconsin courts apply the harmless error test in § 971.31(10) appeals and the manifest injustice test in other legally distinct circumstances does not make case law inconsistent.

¶43     We could end our analysis here, since we are bound by Wisconsin Supreme Court precedent to apply the harmless error test. *See Cook v. Cook*, 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997). We nevertheless address the State's two remaining arguments in favor of changing the standard and explain why neither is persuasive.

¶44     First, the State argues that the language of WIS. STAT. § 971.31(10) does not "clearly express" an intent to abrogate the common law manifest injustice framework or to relieve defendants of the burden to show a manifest injustice warranting plea withdrawal. However, if a common law rule would undermine a statute's "manifest purpose," there is "no doubt of the legislature's intent" to abrogate that rule. *MBS-Certified Pub. Accountants, LLC v. Wisconsin Bell, Inc.*, 2012 WI 15, ¶71, 338 Wis. 2d 647, 809 N.W.2d 857; *see also Moya v. Aurora Healthcare, Inc.*, 2017 WI 45, ¶34, 375 Wis. 2d 38, 894 N.W.2d 405.

¶45     The purpose of § 971.31(10) is to promote judicial economy by offering defendants an incentive to plead guilty in cases where a crucial issue is "whether the order denying a motion to suppress was proper." *Riekkoff*, 112

18

Wis. 2d at 125.[12] The statute serves this purpose because defendants are more likely to plead guilty when they know that, if it is determined on appeal that the circuit court erroneously failed to suppress evidence, their conviction will be reversed and they are entitled to a trial unless the State proves that the error was harmless. But if the manifest injustice standard applied, the burden would instead be shifted to defendants. Defendants would have to prove the very same standard that applies in plea withdrawal situations *not* governed by § 971.31(10)—that the erroneous failure to suppress evidence caused a "manifest injustice." And on direct appeal, defendants would not even have an opportunity for an evidentiary hearing, where they could introduce evidence necessary to satisfy their burden of proof.[13]

¶46 For these reasons, WIS. STAT. § 971.31(10) would provide defendants little incentive to plead guilty if courts adopted the manifest injustice standard for appeals under § 971.31(10). More cases would go to trial, needlessly taxing the resources of circuit courts, public defenders, the appointed defense bar, and district attorneys alike. "We must presume that the legislature intends for a statute to be interpreted in a manner that advances the purposes of the statute," *Verdoljak v. Mosinee Paper Corp.*, 200 Wis. 2d 624, 635, 547 N.W.2d 602 (1996), but the

---

[12] Many other cases, including persuasive authority, have reached the same conclusion regarding the purpose of WIS. STAT. § 971.31(10). *See, e.g.*, *Jones v. Wisconsin*, 562 F.2d 440, 445-46 (7th Cir. 1977) (section 971.31(10) "encourages guilty pleas" by guaranteeing that a defendant "will have a full trial in the event that after appeal the state's evidence is weaker than it appeared at the time of the trial court's evidentiary rulings"); *State v. Meier*, 60 Wis. 2d 452, 461, 210 N.W.2d 685 (1973); *State v. Pozo*, 198 Wis. 2d 705, 715, 544 N.W.2d 228 (Ct. App. 1995). The comments to the statute's enactment also state its purpose. *See* § 971.31(10), Judicial Council Committee comment to 1969 enactment (the statute "should reduce the number of contested trials since in many situations, the motion to suppress evidence is really determinative of the result of the trial").

[13] *See Nelson v. State,* 54 Wis. 2d 489, 497-98, 195 N.W.2d 629 (1972) (a defendant proceeding on a motion to withdraw a guilty plea is entitled to an evidentiary hearing if they allege facts that, if true, would entitle them to relief).

State's proposed manifest injustice test for § 971.31(10) appeals would significantly undermine the statute's purpose of incentivizing pleas.

¶47 Second, the State argues that we should adopt the manifest injustice test because Wisconsin courts have not always consistently articulated the standard for harmless error. *Compare **Armstrong***, 223 Wis. 2d at 369 (articulating the standard as asking "whether there is *a reasonable possibility* that the error *contributed* to the conviction") (emphasis added) *with **State v. Hale***, 2005 WI 7, ¶60, 277 Wis. 2d 593, 691 N.W.2d 637 (articulating the standard as whether the State has "prove[n] *beyond a reasonable doubt* that the error complained of *did not contribute* to the verdict obtained") (emphasis added, internal quotations omitted). But even if these standards are inconsistent and should be clarified by our supreme court,[14] this is not a reason to reject the harmless error test in favor of a manifest injustice test that has never before been applied in a WIS. STAT. § 971.31(10) appeal.

¶48 In summary, the State offers no compelling reason to depart from precedent and require a defendant to show a manifest injustice to prevail in a WIS. STAT. § 971.31(10) appeal.

¶49 We now turn to the harmless error test to determine whether Abbott's conviction should be reversed. In a harmless error analysis, a court may consider, among other things, "whether the erroneously admitted evidence duplicates untainted evidence." *Rockette*, 287 Wis. 2d 257, ¶26 (quoting *Hale*, 277 Wis. 2d

---

[14] At least one Wisconsin Supreme Court opinion appears to essentially equate the two standards. In *State v. Jackson*, 2014 WI 4, 352 Wis. 2d 249, 841 N.W.2d 791, the court considered whether improperly admitted character evidence warranted a new trial and concluded that any error would have been harmless. *Id.*, ¶88. *Jackson* articulated *both* the *Hale* standard for harmless error (the court must conclude beyond a reasonable doubt that, but for the errors, the result would have been the same), *id.*, ¶86, *and* the *Armstrong* standard (the court must determine whether there is a reasonable probability that the errors contributed to the result), *id.*, ¶87.

593, ¶61); *see also* **Armstrong**, 223 Wis. 2d at 370 (concluding that failure to suppress evidence "identical to other admissible evidence" was harmless error).

¶50 The State argues that evidence gathered from the patient belongings bag does little more than duplicate untainted evidence, and we agree. The patient belongings bag contained Abbott's shoes and socks, on which Miller's blood was found, but Miller's blood was also found on untainted evidence—it was on Abbott's sweatshirts (as well as on his pickup truck.) Thus, even if the evidence gathered from the patient belongings bag were suppressed, the State would still have been able show that Miller's blood was on Abbott's clothing when he returned home on January 3, 2011. Abbott does not rebut this conclusion with any persuasive argument that suppression of the evidence from the patient belongings bag would have changed his decision to enter the *Alford* plea. Accordingly, we conclude that the State has met its burden to prove that the circuit court's failure to suppress the clothing from the bag was harmless.

## CONCLUSION

¶51 For all of these reasons, we conclude that the circuit court did not err by denying Abbott's motions to suppress evidence gathered from his sweatshirts or statements made during his February 1 interrogation. We also conclude that the State did not meet its burden to prove that the seizure of the patient belongings bag falls within an exception to the warrant requirement. Nevertheless we conclude that the circuit court's failure to suppress this evidence was harmless. Accordingly, we affirm.

*By the Court.*—Judgment affirmed.